UNITED STATES of America

v.

**Ralph L. MALING, Keith V. Maling, Chris E. Maling, Al Maling, Richard Booker, Mark Gill (aka "Fish"), Timothy Hanscom, Michael (aka "Big Mike") Hurley, John Monroe, Ralph G. Richard, Paul Rizzo, William (aka "Billy") Shaw, Robert S. (aka "Bobby" Stowe), Richard Sullivan, and Emelio Doe (aka "Emelio").**

**Crim. No. 88–116–C.**

United States District Court, D. Massachusetts.

May 16, 1990.

---

**4.** At the Post Office Agent Bradford had asked Defendant whether he had any weapons.

Paul Kelly, Brien T. O'Connor, Boston, Mass., for U.S.

Martin Weinberg, Oteri, Weinberg & Lawson, Boston, Mass., for Keith Maling.

## MEMORANDUM

CAFFREY, Senior District Judge.

This case is now before the Court on defendant Keith Maling's motion to suppress certain physical evidence seized by the New Jersey State Police from an automobile operated by the defendant on Interstate 80 in New Jersey. On February 26, 1982, Keith Maling was driving a 1979 Ford LTD automobile registered in Massachusetts to a Scott Arey. Keith Maling, the driver, was accompanied by one passenger, Robert McIntyre. While driving along Interstate 80 in New Jersey, Keith Maling was stopped for speeding by Trooper Ricardo Ocetnik of the New Jersey State Police. The stop and subsequent investigation of the vehicle led to a warrantless search of the passenger compartment of the vehicle and the seizure of physical evidence, including four plastic bags containing a greenish brown vegetation suspected to be marijuana, another plastic bag containing seeds, vegetation and two partially burned marijuana cigarettes, and seeds and vegetation

scattered on the seat and floor. Based upon the evidence seized during the search of the passenger compartment and other facts, Keith Maling was arrested for possession of marijuana and a warrant was obtained to search the trunk of the vehicle. The search of the trunk uncovered other physical evidence, specifically $108,000.00 found in a duffle bag and $600.00 found in a manicure kit inside the duffle bag. The police also seized $1,190.00 from the person of Keith Maling.

Asserting his fourth amendment rights, Keith Maling now challenges the legality of the seizure and search of the leather pouch, the search of the passenger compartment, and the search of the trunk, and moves to suppress any and all evidence seized during those searches and from his person.

## I.

The Court conducted an evidentiary hearing on this motion to suppress on April 18, 1990. At the hearing, the Court heard testimony from Trooper Ocetnik, the New Jersey State Police Trooper who conducted the searches of the vehicle and obtained the warrant, and from Robert McIntyre, the passenger in the 1979 Ford LTD automobile driven by Keith Maling. The Court also received in evidence several exhibits, including an application for a search warrant, a search warrant, a return of a search warrant, and a New Jersey State Police Arrest Report.

### A. Stop and Warrantless Search of Vehicle

Trooper Ocetnik testified that on February 26, 1982 he stopped a maroon and white, 1979 Ford two-door automobile for speeding on Interstate 80 East. He stated that the car was travelling at a speed of 79 miles per hour and was occupied by two white males. As Ocetnik was pulling the car over, he testified that he observed the passenger lean forward and toward the right as if he were placing something on the right side of the seat. Ocetnik stated that because of the passenger's movements, he became suspicious.

Ocetnik testified that he stopped his vehicle behind the 1979 Ford automobile. After advising the state police barracks of the location of the stop, Ocetnik approached the vehicle. Ocetnik testified that he approached the vehicle on the passenger side for his own personal safety. He stated that he was especially concerned about his safety at the time because the state police had been alerted to keep watch for two suspects wanted for the murder and attempted murder of law enforcement officers. Ocetnik was given photographs of these suspects which he kept in his police car at the time. Ocetnik testified that he was also concerned for his safety because of the suspicious movements which he observed the passenger make.

When Ocetnik approached the vehicle on the passenger side, he testified that both occupants of the car were looking to the left expecting his arrival on the driver's side. While the occupants of the car were unaware of his presence, he was able to get a better look at them. Ocetnik testified that he noticed that the passenger and the driver resembled the two murder suspects of which he had been alerted. He thus became even more suspicious and cautious.

Standing a few inches behind the passenger door to avoid being hit by the door if it opened, Ocetnik knocked on the passenger window. According to Ocetnik, the passenger appeared startled and spontaneously opened his door. Ocetnik testified that he immediately slammed the door shut, but that while it was open he had noticed a brown leather object between the seat and the door. Ocetnik testified that upon this initial observation he thought that the object was a holster. He stated that he had seen holsters before and that this leather object resembled one. Thus, Ocetnik stated that after slamming the door shut, he immediately reopened the door, grabbed the leather object, and shut the door again. As Ocetnik testified, however, once he had the object in hand, he discovered that it was not a holster, but rather a six by eight inch, brown leather pouch, similar to a money pouch.

After satisfying himself that the leather object was not a holster, Ocetnik stated, he reopened the door and told the occupants of the car to place their hands on the dashboard. Ocetnik testified that at this point he still suspected that the occupants of the car were the wanted murder suspects. Ocetnik testified that from the information given to him regarding these murder suspects, he knew that the one suspect who resembled the passenger, Robert McIntyre, could be identified by tattoos on his forearms. Consequently, Ocetnik asked McIntyre to roll up his sleeves and expose his forearms. As Ocetnik discovered, McIntyre had no tattoos.

Upon finding no tattoos, Ocetnik testified, he became a little more relaxed. Ocetnik stated that he then asked McIntyre and the driver, Keith Maling, for identification. Maling produced a Florida license and McIntyre produced a North Carolina license. Ocetnik learned that the car was registered in Massachusetts to Scott Arey. Ocetnik testified that when he asked who Scott Arey was, Maling responded that he was a friend for whom he was driving the car to New York.

According to Ocetnik's testimony, at this time he was also able to observe more closely the leather pouch he had seized from the vehicle. Ocetnik testified that the pouch was open approximately two inches and that through this opening he saw a plastic bag containing a greenish brown vegetation which he suspected to be marijuana. Ocetnik stated that he opened the leather pouch more and found it to contain four bags of a substance he suspected to be marijuana. After reading Maling and McIntyre their Miranda rights, Ocetnik stated, he placed both under arrest for possession of marijuana. Ocetnik testified that he handcuffed McIntyre, but not Maling because he only had one set of handcuffs.

After placing them under arrest, Ocetnik testified that he searched the passenger compartment of the vehicle. Under the driver seat, Ocetnik found a plastic bag containing seeds, bits of marijuana, and two partially burned, hand rolled, marijua-na cigarettes. Also, Ocetnik noticed that the jack for the car was under the seat and that clothing and fast food wrappers were strewn throughout the passenger compartment. Near the rear of the passenger compartment, Ocetnik testified, he detected the smell of marijuana "in its raw form," that is, before it is burned. According to his testimony, Ocetnik suspected that there was more marijuana in the trunk.

Ocetnik stated that while he was standing near the rear of the vehicle with Maling, he told Maling of his suspicions and that he wanted to search the trunk. Ocetnik further stated that he advised Maling of his rights and told him that he could refuse to give permission to open the trunk. Maling refused to open the trunk. According to Ocetnik, he then informed Maling that he would get a warrant to search the trunk. Thereafter, according to Ocetnik, Maling agreed to open the trunk, but only opened it partially for about two or three seconds before slamming it shut. Ocetnik testified that although he did not see anything while the trunk was open, he again detected the smell of unburned marijuana.

At the evidentiary hearing on this motion, this Court also heard testimony from Robert McIntyre, the passenger in the vehicle with Keith Maling. McIntyre testified to a different set of facts and chronology of events than did Trooper Ocetnik. Although the two testimonies were somewhat consistent, they were inconsistent as to specific facts which are crucial to determination of this motion. Specifically, McIntyre testified that when he opened the passenger door, Ocetnik had his gun drawn and placed it to his head saying "don't move or I'll blow your ... head off." According to McIntyre, Ocetnik then asked him to place his hands on the dashboard and roll up his sleeves. McIntyre stated that Ocetnik told him he was looking for tattoos because he, McIntyre, resembled a murder suspect. McIntyre testified that after Ocetnik saw no tattoos, he asked McIntyre if he wanted to see a picture of the suspect who he resembled. McIntyre said "yes," and began to get out of the vehicle. According to McIntyre, it was at

this point that Ocetnik saw the leather pouch and seized it. McIntyre stated that he had closed the zipper of the pouch completely before placing it next to his seat. He testified that he had told Ocetnik that the pouch was his and asked him not to open it, but that Ocetnik had ignored his request and opened it. McIntyre testified that the marijuana found in the pouch was also his.

The testimonies of McIntyre and Ocetnik are clearly inconsistent. According to McIntyre, Ocetnik drew his gun, checked for tattoos, dispelled his fear, put his gun in its holster, and then seized the leather pouch. According to Ocetnik, he seized the leather pouch, which he believed to be a holster, when he first confronted Maling and McIntyre at the car while he was concerned for his safety because he thought they might be the murder suspects. After seizing the pouch, Ocetnik testified, he then checked for tattoos and asked for identification to dispel his fear. The two testimonies are also inconsistent on the question of whether the leather pouch was partially open or completely closed. McIntyre testified that he closed the pouch completely while Ocetnik stated that the pouch was open one or two inches.

After listening to the testimony and examining the other evidence, this Court finds Ocetnik's account and chronology of events to be credible. After viewing McIntyre place something alongside his seat while he was pulling the vehicle over, it is reasonable that Ocetnik would immediately look alongside the seat when the door was opened. Then, seeing an object resembling a holster next to the seat, it is further reasonable and believable that the first act Ocetnik would take would be to grab this leather object possibly containing a weapon. This Court also finds reasonable and credible Ocetnik's testimony that after assuring himself that the leather pouch was not a holster and did not contain a weapon, but still suspicious of the two men and cautious, Ocetnik then checked for tattoos and asked for identification.

This Court also believes Ocetnik that the pouch was open one or two inches. Although McIntyre stated that he was sure he closed it, this Court finds relevant the fact that McIntyre was closing the pouch and placing it next to his seat hastily because the police were pulling the vehicle over. Acting in haste, it is likely that McIntyre did not completely close the pouch. Thus, in deciding this motion this Court accepts the account and chronology of events testified to by Ocetnik and rejects the inconsistent testimony of McIntyre.

### B. Warrant Search of Vehicle

Once backup state troopers had arrived at the scene, Maling and McIntyre were transported to the Little Falls, New Jersey police barracks where they were again advised of their rights and processed. The 1979 Ford automobile was also transported to the same location. Based on the evidence seized from the passenger compartment of the vehicle, Ocetnik applied for and obtained a warrant to search the trunk of the car. The application for a warrant specified items which Ocetnik stated he had reason to believe were present in the trunk:

A. Items listed under the New Jersey Controlled Dangerous Substance Acts, that is: Marihuana.

B. Items used for the purpose of processing, weighing, packaging, diluting, and the administration of these controlled substances, that is: packaging paper, scales, and cigarette papers.

C. Documents and papers pertaining to the illegal possession, use, distribution, and trafficking in controlled dangerous substances, that is: telephone numbers, addresses, any business records, monies.

D. Instruments for the prevention of the detection of crime, that is: firearms.[1]

In the application for a warrant, Ocetnik also stated the facts upon which he based his belief to establish probable cause for the warrant. The grounds for his belief stated in the application included 1) the

---

1. The search warrant used the identical language in specifying the property which could be seized during execution of the search.

plastic bags of marijuana found inside the brown leather pouch that was seized from between the seat and the passenger door; 2) the plastic bag containing seeds, marijuana bits and two partially burned marijuana cigarettes found under the driver's seat; 3) traces of brownish green vegetation scattered on the front seat and on the floor of the car; and 4) the odor of marijuana detectable in the rear of the passenger compartment. Ocetnik did not include, as a ground for the warrant, his detection of the odor of marijuana when Maling had opened the trunk. In the application, he only mentioned the smell of marijuana that he detected in the rear of the passenger compartment.

Upon examination of Ocetnik and the application for a warrant, Judge Donatelli of the superior court, Passaic County, issued a search warrant to search the vehicle for the exact items specified in the application for a warrant. A copy of the warrant was served on Keith Maling, and the search was executed. The belongings of Keith Maling were removed from the trunk and searched in his presence. Confiscated from Maling's belongings were one plastic bag containing greenish brown vegetation and one plastic bag containing sixteen white tablets and five brown tablets. The belongings of Robert McIntyre were also removed from the trunk and searched in McIntyre's presence. McIntyre opened a combination lock on a green canvas duffle bag which he testified he owned. Inside the duffle bag, the police found and confiscated $108,000.00 in cash which was found in a brown paper bag. Also inside the duffle bag, the police found a manicure kit containing $600.00 in cash; this money was also seized. In the indentations on the floor of the trunk, the police also found

marijuana residue which was vacuumed from the trunk and stored.

## II.

"In order to effectuate the Fourth Amendment's guarantee of freedom from unreasonable searches and seizures, the [Supreme] Court long ago conferred upon defendants in federal prosecutions the right, upon motion and proof, to have excluded from trial evidence which had been secured by means of an unlawful search and seizure." *Simmons v. United States,* 390 U.S. 377, 389, 88 S.Ct. 967, 973, 19 L.Ed.2d 1247 (1968) (citing *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914)). Because fourth amendment rights are personal rights which may not be vicariously asserted, only a defendant whose own rights have been infringed may invoke the exclusionary rule to prevent the use of evidence obtained by an unlawful search and seizure. *Rakas v. Illinois,* 439 U.S. 128, 134, 138, 99 S.Ct. 421, 427, 58 L.Ed.2d 387 (1978); *Simmons,* 390 U.S. at 389, 88 S.Ct. at 973; *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969). The proponent of a motion to suppress has the burden of establishing that his own fourth amendment rights have been violated. *Rakas,* 439 U.S. at 131 n. 1, 99 S.Ct. at 424 n. 1; *Simmons,* 390 U.S. at 389–90, 88 S.Ct. at 973–74.

### A. Expectation of Privacy

To establish a violation of his fourth amendment rights, a defendant must first show that he had a legitimate or reasonable expectation of privacy in the place searched or the thing seized.[2] *See Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *Rakas,*

2. In *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, the Supreme Court "... abandoned a separate inquiry into a defendant's 'standing' to contest an allegedly illegal search in favor of an inquiry that focused directly on the substance of the defendant's claim that he or she possessed a 'legitimate expectation of privacy' in the area searched." *Rawlings,* 448 U.S. at 104, 100 S.Ct. at 2561. Analyzed under substantive fourth amendment law rather than in terms of standing, "... the question is whether the challenged search and seizure violated the Fourth Amend-

ment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Rakas,* 439 U.S. at 140, 99 S.Ct. at 428. Accordingly, this Court addresses Maling's and the government's 'standing' arguments by applying a fourth amendment analysis as to whether Maling possessed a reasonable expectation of privacy in each place or thing searched.

439 U.S. at 143, 99 S.Ct. at 430; *Rawlings v. Kentucky*, 448 U.S. 98, 104–06, 100 S.Ct. 2556, 2561–63, 65 L.Ed.2d 633 (1980). *See also United States v. Thornley*, 707 F.2d 622, 624 (1st Cir.1983) (citing *United States v. Hershenow*, 680 F.2d 847, 855 (1st Cir. 1982)). The legitimate or reasonable expectation of privacy inquiry involves two questions: whether the individual has exhibited a subjective expectation of privacy and whether this subjective expectation, when viewed objectively, is "reasonable" or "justifiable" under the circumstances. *Smith*, 442 U.S. at 740, 99 S.Ct. at 2580. In determining whether a defendant has legitimate expectation of privacy in the particular place searched or thing seized, "arcane" concepts of property law do not control although such property rights as ownership and possession are to be considered. *Rakas*, 439 U.S. at 143, 99 S.Ct. at 430; *Rawlings*, 448 U.S. at 105, 100 S.Ct. at 2561.

■ In light of these principles, this Court must first decide whether Keith Maling had a legitimate expectation of privacy in the passenger compartment of the vehicle, in the trunk of the vehicle, and in the leather pouch. Under both a subjective and an objective analysis, this Court finds that Maling had a reasonable expectation of privacy in the passenger compartment and the trunk of the vehicle. Although the vehicle was owned by Scott Arey, property rights do not control whether a person possesses a reasonable expectation of privacy in a place or thing. *See Rakas*, 439 U.S. at 143, 99 S.Ct. at 430. In this situation, Arey had asked Maling to drive the car to New York for him, and during the drive, Maling had complete dominion and control over the vehicle. Thus, it was reasonable for him to have an expectation of privacy in both the passenger compartment and the trunk of the car.

■ The question of whether Maling had a legitimate expectation of privacy in the pouch is more difficult. McIntyre admitted to ownership of the pouch and the marijuana within it. Although property rights do not control this determination, ownership is a fact to be considered. *Rawlings*, 448

U.S. at 105, 100 S.Ct. at 2561. Moreover, the pouch was found on the right side of the passenger seat, not within reach of Maling, and McIntyre stated that he had exercised control over his pouch and moved it next to his seat. This Court recognizes that McIntyre also testified that before he placed the pouch next to his seat, it was lying between Maling and himself on the front seat. There is no evidence, however, that Maling exercised any control or could have exercised control over the pouch belonging to McIntyre. For these reasons, this Court concludes that Maling did not have an actual expectation of privacy in the pouch and that, even if he did, such a subjective expectation would have been unreasonable. Thus, Maling can not challenge the search of the pouch itself.

■ Challenging the search of the pouch, however, must be distinguished from challenging the seizure of the pouch from the passenger compartment. Regardless of the conclusion that Maling did not have a legitimate expectation in the pouch, it is undisputed that the pouch was located within the passenger compartment of the vehicle, an area in which Maling had a reasonable expectation of privacy. Thus, because the pouch was a container located within the passenger compartment and its seizure required an intrusion into that compartment, Maling may challenge the initial seizure of the pouch from the vehicle.

**B. Reasonableness of the Searches**

Having concluded that Maling possessed an expectation of privacy in the passenger compartment and trunk of the car, but not in the leather pouch itself, this Court's next inquiry is into the legality of the searches, that is, whether the searches of these areas unreasonably infringed upon Maling's fourth amendment interests. In appropriate circumstances and upon reasonable suspicion, the police may detain "a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). During a reasonable investigatory detention, to assure his or

her own safety a police officer who has reason to believe that an individual is armed and dangerous may conduct a limited protective search for weapons. *Id.* at 24, 30, 88 S.Ct. at 1881, 1884. Such a protective search may extend to those areas of the passenger compartment of an automobile in which a weapon may be placed or hidden, "so long as the police possess an articulable and objectively reasonable belief that the suspect is potentially dangerous." *Michigan v. Long*, 463 U.S. 1032, 1049, 1051, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201 (1983); *Adams v. Williams*, 407 U.S. 143, 146–48, 92 S.Ct. 1921, 1923–25, 32 L.Ed.2d 612 (1972).

█ In light of these standards, Trooper Ocetnik's stop, detention, and investigation of Maling for a speeding violation where he was travelling at a speed of 79 miles per hour were clearly justified and lawful. During this investigatory stop, Ocetnik had reason to be concerned for his safety. As he testified, when he was pulling the vehicle over, he saw the passenger place something on the side of his seat. This movement raised an initial suspicion. Ocetnik also testified that he believed that Maling and McIntyre strongly resembled two murder suspects wanted for the murder and attempted murder of law enforcement officials. Moreover, when McIntyre opened the passenger door, Ocetnik stated that he saw a leather object which he believed to be a holster. Accordingly, Ocetnik had articulable reason to believe that these two individuals might be armed and dangerous. Thus, Ocetnik was justified in conducting a protective search for weapons, and his seizure of the leather pouch,

believed to be a holster, was reasonable and lawful.

Because Maling possessed no expectation of privacy in the leather pouch itself, this Court need not determine whether Ocetnik's search of the pouch was lawful. Even if the pouch was completely closed as McIntyre claimed, Ocetnik's opening of the pouch did not violate any rights of Maling because he possessed no privacy interest in it. Thus, because Ocetnik's seizure of the pouch from the passenger compartment was lawful and because his search of the pouch did not infringe on any interest of Maling's, the pouch and the marijuana found within it should not be suppressed.[3]

█ After finding the marijuana within the pouch, Ocetnik placed Maling and McIntyre under arrest for possession of marijuana.[4] Ocetnik's subsequent search of the passenger compartment of the car, therefore, qualifies as a search incident to arrest. The Supreme Court has held that "... when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment.... and any containers found within the passenger compartment" of that automobile. *New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981). Accordingly, Ocetnik's search of the passenger compartment was lawful, and all evidence seized during that search should not be suppressed.

█ Maling's last challenge is to the search of the trunk of the automobile. Maling first challenges Ocetnik's warrantless search of the trunk on the highway. Maling argues that Ocetnik threatened him with a search warrant and coerced him into

---

**3.** Even assuming that Maling did possess an expectation of privacy in the pouch, this Court believed the testimony of Ocetnik that the pouch was open one to two inches and that he could see a greenish brown vegetation in a plastic bag through the opening. Under the plain view doctrine, Ocetnik was justified in seizing the marijuana within the pouch because he inadvertently came across this evidence in the course of a lawful intrusion. *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971).

**4.** Maling argued that his arrest for possession of marijuana was an unlawful arrest because the marijuana was owned by and in the possession of McIntyre. Maling's argument fails because despite ownership of the marijuana, Maling and McIntyre could still jointly possess the marijuana. Moreover, Maling was driving the vehicle and had dominion and control over the entire vehicle; thus, the vehicle and its entire contents were arguably within his possession. Accordingly, sufficient probable cause to arrest Maling for possession of marijuana existed, and the arrest was lawful.

opening the trunk and that the search was therefore involuntary. This Court is not convinced by Maling's argument. Maling has produced no evidence to support his argument that his consent to open the trunk was in any way involuntary. Ocetnik testified that Maling first refused to open the trunk and then decided to open the trunk after Ocetnik told him he would obtain a warrant. This testimony does not establish that Maling's consent was involuntary, but rather assists the government in proving that Maling's consent was freely and voluntarily given. *See Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968).[5]

■ Moreover, according to Ocetnik's testimony, Maling opened the trunk only two feet and only for a few seconds. Ocetnik testified that he saw nothing while the trunk was open, although he did detect the odor of raw marijuana. Significantly, however, Ocetnik did not use the odor of marijuana emanating from the trunk to establish probable cause in his application for a search warrant. Thus, although this Court finds the search of the trunk on the highway to be consensual, even if it were found to be unlawful, it would not affect the legality of the warrant search of the trunk because nothing discovered during that highway search was used to obtain the warrant.

In challenging the legality of the warrant search of the trunk, Maling argues that the search warrant was based on evidence and facts discovered during the prior warrantless searches which Maling argues were illegal. Maling contends that when excised of these illegalities, the warrant is not supported by probable cause. Having concluded that the warrantless searches of the leather pouch, the passenger compartment and the trunk were reasonable and lawful, this Court finds no illegalities which should be excised from the warrant.

■ The final issue for this Court, then, is whether the application for the search warrant stated facts sufficient to establish probable cause for the issuance of the search warrant. The traditional standard for review of a magistrate's or judge's probable cause determination in issuing a warrant has been and remains whether the magistrate or judge had a "substantial basis for ... conclud[ing]" that probable cause existed, that is, that the search would uncover evidence of wrongdoing. *Illinois v. Gates*, 462 U.S. 213, 236, 238–39, 103 S.Ct. 2317, 2331, 2331–32, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). Defining probable cause, the Court of Appeals for the First Circuit has stated:

> " '[P]robable cause' need not be tantamount to 'proof beyond a reasonable doubt.' " It is enough if the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it.

*United States v. Aguirre*, 839 F.2d 854, 857–58 (1st Cir.1988) (citations omited) (quoting *United States v. Hoffman*, 832 F.2d 1299, 1305–06 (1st Cir.1987)). Upon review of the application for the search warrant, completed and sworn to by Trooper Ocetnik, this Court finds that sufficient facts were stated to demonstrate probable cause for the issuance of the warrant. First, Ocetnik found four plastic bags of marijuana within the leather pouch. Second, in the passenger compartment, he found another plastic bag containing seeds, bits of greenish brown vegetation and two partly burned marijuana cigarettes in addition to bits of vegetation and seeds scattered on the seat and floor. Third, he observed that clothes and fast food wrap-

---

5. This case is distinguishable from *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788 (1968). In *Bumper*, the search was permitted because the officer lied and said he had a warrant, and the court held that the search could not be justified as consensual. *Id.* at 547–48, 88 S.Ct. at 1791–92. In this case, Ocetnik simply said that he would obtain a warrant, not that he had one, and Maling decided to voluntarily open the trunk. Unlike the petitioner's grandmother in *Bumper*, Maling did not acquiesce to a claim of lawful authority. Maling's consent was voluntary.

pers were scattered throughout the compartment and that a jack, normally stored in the trunk, was under the seat. Fourth, he detected the odor of marijuana in its raw form in the rear of the passenger compartment, near the trunk. These facts clearly establish a substantial basis for the judge's finding of probable cause for the issuance of the warrant to search the trunk in this case. Accordingly, this Court finds that the warrant was supported by sufficient probable cause and the search of the trunk pursuant to this warrant was legal. The motion to suppress the evidence found during this search should therefore be denied.

For the foregoing reasons, Keith Maling's motion to suppress should be denied on all grounds.

Order accordingly.